# UNITED STATES DISTRICT COURT FOR
# THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THOMAS SCHUMAN, | ) |
|         Plaintiff, | ) Case No. _____ |
|   v. | ) JURY TRIAL DEMANDED |
| HENNESSY CAPITAL ACQUISITION CORP. IV, DANIEL J. HENNESSY, GREG ETHRIDGE, BRADLEY BELL, RICHARD BURNS, JUAN CARLOS MAS, GRETCHEN W. MCCLAIN, JIM O'NEIL III, and PETER SHEA, | ) ) ) ) ) ) ) |
|         Defendants. | ) |

**COMPLAINT FOR VIOLATION OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, Thomas Schuman ("Plaintiff"), by his undersigned attorneys, for this complaint against defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

**NATURE OF THE ACTION**

1. This is an action brought by Plaintiff against Hennessy Capital Acquisition Corp. IV ("HCAC" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with HCAC, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) and Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in connection with the proposed merger of the Company, HCAC IV First Merger Sub, Ltd. ("First Merger Sub"), a wholly-owned subsidiary of the Company, HCAC IV Second Merger Sub, LLC ("Second Merger Sub"), another wholly-owned subsidiary of the Company, and Canoo

1

Holdings Ltd. ("Canoo") ("Proposed Transaction"). Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law.

2. On August 17, 2020, HCAC entered into an agreement and plan of merger with Canoo, First Merger Sub, and Second Merger Sub ("Merger Agreement"), whereby First Merger Sub will merge with and into Canoo, with Canoo surviving the merger as a wholly-owned subsidiary of HCAC ("First Merger"). After the First Merger, Canoo will merge with and into Second Merger Sub, with Second Merger Sub surviving the merger ("Second Merger"). After completion of the two mergers, Canoo will be a wholly-owned, direct subsidiary of HCAC.

3. Upon consummation of the Proposed Transaction, Canoo shareholders in the aggregate will be entitled to receive 175 million newly issued shares of HCAC Class A Common Stock, valued at $10 per share ("Merger Consideration").

4. On November 27, 2020, in order to convince HCAC public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading Registration Statement on the Form S-4/A (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

5. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the financial projections for Canoo; (ii) whether HCAC's financial advisors, Nomura Securities International, Inc. ("Nomura") and Stifel, Nicolaus & Company, Incorporated ("Stifel") were paid advisory fees for their involvement in the Proposed Transaction; (iii) whether Nomura and Stifel had previously been engaged by Canoo; and (iv) information provided in the *Background of the Business Combination*.

6. The Proposed Transaction is expected to close in the fourth quarter of 2020, so the special meeting of HCAC's shareholders to vote on the Proposed Transaction will be held within the next month ("Shareholder Vote"). Therefore, it is imperative that the material information that has

been omitted from the Proxy be disclosed prior to the Shareholder Vote, so the Company's shareholders can properly exercise their corporate voting rights.

7. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, unless and until the material information discussed below is disclosed to HCAC's public common shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec. Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." *Id.* at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. §

78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, HCAC's common stock trades on the NasdaqCM, which is headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases). Further, the Company's transfer agent, Continental Stock Transfer & Trust Company is located in this District at One State Street Plaza, New York, NY 10004. In addition, both Nomura and Stifel are located in this District. Nomura is located at 309 West 49th St., New York, NY 10019, while Stifel is located at 787 7th Ave., New York, NY 10019. Last, the Company's auditor, Withum Smith & Brown, PC is located in this District at 1411 Broadway, New York, NY 10018.

## PARTIES

11. Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of HCAC common stock.

12. Defendant HCAC is a public company incorporated under the laws of Delaware with principal executive offices located at 3415 N. Pines Way, Wilson, WY 83014. HCAC's common stock is traded on the NasdaqCM under the ticker symbol "HCAC."

13. Defendant Daniel J. Hennessy is, and has been at all relevant times, a director of the Company, Chairman of the Board, and Chief Executive Officer.

14. Defendant Greg Ethridge is, and has been at all relevant times, a director of the Company and President.

15. Defendant Bradley Bell is, and has been at all relevant times, a director of the Company.

16. Defendant Richard Burns is, and has been at all relevant times, a director of the Company.

17. Defendant Juan Carlos Mas is, and has been at all relevant times, a director of the

4

Company.

18. Defendant Gretchen W. McClain is, and has been at all relevant times, a director of the Company.

19. Defendant Jim O'Neil III is, and has been at all relevant times, a director of the Company.

20. Defendant Peter Shea is, and has been at all relevant times, a director of the Company.

21. The defendants identified in paragraphs 13 through 20 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with HCAC, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

22. HCAC is a special purpose acquisition company (SPAC), which raised $300 million in its IPO in March 2019 and is now listed on the NASDAQ Stock Exchange. The Company is actively seeking to invest in, and introduce to the public markets, a compelling best-in-class industrial growth or industrial infrastructure company with an enterprise value of approximately $750 million or greater.

23. Canoo is a Los Angeles-based company that has developed breakthrough electric vehicles from the ground up, reinventing the automotive landscape with bold innovations in design, pioneering technologies, and a unique business model that defies traditional ownership to put customers first. Distinguished by its experienced team – numbering nearly 300 employees from leading tech and automotive companies – Canoo has designed a modular skateboard platform purpose-built to deliver maximum vehicle interior space and adaptable to support a wide range of vehicle applications for consumers and businesses. Canoo expects to launch its first consumer model in 2022, simply named the canoo and available only by subscription, followed shortly after by a last-mile delivery vehicle and a sport vehicle, each built off of the same underlying skateboard platform.

5

24. According to the August 18, 2020, joint press release announcing the Proposed Transaction:

**ELECTRIC VEHICLE COMPANY CANOO TO LIST ON NASDAQ THROUGH MERGER WITH HENNESSY CAPITAL ACQUISITION CORP IV**

**LOS ANGELES, CA (August 18, 2020)** – Canoo Holdings Ltd. ("Canoo"), a company developing breakthrough electric vehicles (EV) from the ground up, and Hennessy Capital Acquisition Corp. IV ("HCAC") (NASDAQ: HCAC), a special purpose acquisition company, today announced they have entered into a definitive agreement for a business combination that would result in Canoo becoming a publicly listed company. Upon closing of the transaction, the combined operating company will be named Canoo Inc. and will continue to be listed on the Nasdaq Stock Market under the ticker symbol "CNOO."

Canoo is a high-growth EV company, distinguished by its experienced team with an emphasis on engineering expertise and achievement. Canoo has designed the world's flattest modular "skateboard" platform that allows it to reimagine EV design, maximize usable interior space and support a wide range of vehicle applications. Canoo's skateboard architecture – a unique, self-contained, independently drivable rolling chassis – directly houses all of the most critical components of an EV. It will feature the market's first true steer-by-wire platform, which, along with a composite leaf spring suspension, enables the skateboard's flat structure and maximizes vehicle interior space. Canoo has also developed proprietary electric drivetrain and battery systems which are incorporated into the skateboard. All of Canoo's EVs will share the same skateboard and utilize different cabins or "top hats" that can be paired on top to create unique vehicles. This highly modular approach will facilitate efficient production at scale and enable Canoo to rapidly develop vehicles serving different market and consumer segments at reduced cost, as the majority of research and development and crash testing is built into the skateboard.

Canoo Co-Founder and Chief Executive Officer, Ulrich Kranz said, "Today marks an important milestone of Canoo's effort to reinvent the development, production and go-to-market model of the electric vehicle industry. Our technology allows for rapid and cost-effective vehicle development through the world's flattest skateboard architecture, and we believe our subscription model will transform the consumer ownership experience. We are excited to partner with Hennessy Capital and we are energized to begin our journey through a shared passion to deliver an environmentally friendly and versatile vehicle development platform to the market."

Daniel Hennessy, Chairman & Chief Executive Officer of HCAC said, "We are thrilled to partner with Canoo on their mission to reinvent urban mobility with a greener, simpler and more affordable portfolio of EV solutions. Unlike any other EV company, Canoo has created a go-to-market strategy that captures both B2C and B2B demand with the same skateboard architecture and technology that has already been validated by key partnerships such as with Hyundai. HCAC has an abiding commitment to sustainable technologies and infrastructure, and we are excited to serve as a catalyst to advance the launch of the Canoo vehicle offerings."

Led by Kranz, an automotive industry veteran with more than 30 years of executive experience at BMW, together with nearly 300 employees, the Canoo team has already shown its ability to deliver results by successfully designing, engineering and manufacturing its Beta vehicle in just 19 months and has completed more than 50 physical crash tests. Canoo expects to introduce its first model in 2022 that will be targeted at consumers in major urban markets. This lifestyle vehicle – eponymously named the canoo – leverages the company's low profile skateboard architecture to deliver the highest volume utilization across all classes of competitor vehicles currently on the market and has been purposefully developed for a subscription business model.

In addition, Canoo has designed a commercial delivery B2B vehicle with expected availability in 2023 that directly capitalizes on Canoo's core skateboard technology. Canoo's delivery vehicle competes in a size segment that other competitors are currently not addressing and capitalizes on

the need for a small, city-built, last-mile delivery solution. This high-efficiency platform maximizes cubic cargo volume and targets the fast growing last-mile delivery market.

Canoo's consumer go-to-market strategy capitalizes on changing consumer preferences to deliver a month-to-month, commitment-free, subscription-based business model. With a single monthly fee and no upfront payment, Canoo members enjoy the benefits of an all-inclusive experience that, in addition to your own canoo vehicle, includes maintenance, warranty, registration and access to insurance and vehicle charging. This go-to-market model is designed to deliver an affordable and simplified customer experience while also enhancing lifetime vehicle revenue and margin to shareholders.

(Emphasis in original).

25. The Merger Consideration represents inadequate compensation for HCAC shares. Proxy, 18.

26. Therefore, it is imperative that HCAC shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Proxy, which is necessary for the Company's shareholders to properly exercise their corporate suffrage rights and cast an informed vote on the Proposed Transaction.

**The Proxy Omits Material Information**

27. On November 27, 2020, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Shareholder Vote on the Proposed Transaction is forthcoming. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to make an informed voting decision in connection with the Proposed Transaction, and thus the Proxy should be amended.

28. First, the Proxy fails to provide critical information regarding the financial projections for Canoo.

29. In particular, the Proxy fails to disclose the Net Income projections for Canoo, despite Defendants referencing Net Income throughout the Proxy. Proxy, 32, 36, 88-89, 240-41. Defendants elected to summarize financial projections for Canoo, but they excised and failed to disclose the

readily available Net Income projections. By disclosing certain projections in the Proxy and withholding the Net Income projections, Defendants render the Canoo projections on page 114 of the Proxy materially incomplete and provide a misleading valuation picture of Canoo. Simply put, Net Income projections are irreplaceable when it comes to fully, fairly, and accurately understanding a company's projections and value.

30. Similar to Net Income, the Proxy fails to disclose the cash flow projections ("Cash Flow Projections") for Canoo, even though Defendants clearly utilized Cash flow projections for Canoo – as there was numerous references to it throughout the Proxy. *Id.* at 25, 40, 107. Instead, Defendants elected to exclude the Cash Flow projections, while opting to include EBITDA projections for Canoo. *Id.* at 114. The omission of the Cash Flow projections render the projections on page 114 of the Proxy incomplete and misleading because without the Cash Flow projections, the Proxy provides a misleading overall valuation picture of Canoo.

31. The inclusion of EBITDA projections while excluding Cash Flow projections renders the Proxy incomplete and misleading because Cash Flow projections are widely recognized as the most important valuation metric when it comes to valuing a company and its stock. EBITDA projection metrics are not sufficient analogs for Cash Flow projections. Well settled principles of corporate finance and valuation dictate that the value of companies and their stock should be premised upon the company's projected future cash flows, not projected EBITDA.[1] There are fundamental differences between Cash Flows and EBITDA. EBITDA is not a sufficient alternative to Cash Flows—as Warren Buffet and other financial experts have stated: "References to EBITDA make us shudder. Too many investors focus on earnings before interest, taxes, depreciation, and amortization.

---

[1] Pratt, Shannon. "Net Cash Flow: The Preferred Measure of Return." Cost of Capital. 16. ("Occasionally, we find an analyst treating earnings before interest, taxes, depreciation, and amortization (EBITDA) as if it were free cash flow. This error is not a minor matter…").

That makes sense, only if you think capital expenditures are funded by the tooth fairy." [2] Relying solely on EBITDA to provide a fair summary of a company's financial prospects has numerous pitfalls. EBITDA does not take into account any capital expenditures, working capital requirements, current debt payments, taxes, or other fixed costs that are critical to understanding a company's value.[3] As a result of these material differences between EBITDA and Cash Flows, experts recognize Cash Flows as a much more accurate measure when it comes to analyzing the expected performance of a company.

32. In light of these significant differences between Cash Flow and EBITDA figures, Defendants failure to disclose Cash Flow projections for Canoo provides a materially incomplete and misleading overall valuation picture for HCAC shareholders.

33. Accordingly, the question that the Company's shareholders need to answer in determining whether to vote in favor of the Proposed Transaction is clear: Is the Merger Consideration fair compensation given Canoo's Cash Flow projections? Therefore, Defendants must disclose the Cash Flow projections relied upon by Defendants, so HCAC shareholders can answer this question for themselves.

34. Second, the Proxy states that HCAC did not obtain a fairness opinion in connection with the Proposed Transaction; however, the *Background of the Business Combination* makes it clear that both Nomura and Stifel served as financial advisors to HCAC throughout the process leading up to execution of the Merger Agreement. Proxy, 103, 105. For example, the Proxy says, "Hennessy Capital engaged in multiple discussions with its financial advisors, Nomura and Stifel." *Id.* at 103. As such, the Proxy fails to disclose whether Nomura and Stifel were paid any advisory fees for their involvement, and if so, the amount of advisory fees they received respectively.

---

[2] Elizabeth MacDonald, *the Ebitda folly*, FORBES (March 17, 2003), http://www.forbes.com/global/2003/0317/024.html.
[3] Cody Boyte, *Why EBITDA is Not Cash Flow*, AXIAL FORUM (Nov. 19, 2013), http://www.axial.net/forum/ebitda-cash-flow/ .

35. Third, the Proxy fails to disclose whether Nomura and/or Stifel were previously engaged by Canoo, and if so, what the amount of fees received were and what the nature of those engagements were.

36. Fourth, the Proxy fails to disclose certain critical information in the *Background of the Business Combination*, like: (i) whether HCAC executed confidentiality agreements with the five potential business combination targets it engaged in due diligence with; and (ii) the names of the Canoo representatives involved in the process leading up to execution of the Merger Agreement.

37. To start, the Proxy states that HCAC "engaged in significant due diligence and detailed discussions directly with senior executives and/or shareholders" of five potential business combination targets. *Id.* at 102. However, the Proxy fails to disclose whether the Company executed confidentiality agreements with those five potential targets and if so, whether the confidentiality agreements contained standstill provisions. Further, if the Company did enter into confidentiality agreements with standstill provisions, whether those provisions contained a "don't ask don't waive" ("DADW") provision, including whether those provisions had fallen away upon execution of the Merger Agreement or still remain in effect. Failure to disclose the existence of DADW provisions creates the false impression that an interested party who signed a confidentiality agreement could have made a superior proposal. **But that is not true.** If those confidentiality agreements contained DADW provisions, the interested potential acquirers could only make a superior proposal by breaching their respective agreement, because in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. Thus, the omission of this information renders the Proxy materially misleading.

38. Next, the Proxy states that on June 23, 2020, a "representative of Canoo first contacted" Defendant Hennessy expressing interest in a potential combination with the Company. *Id.* Yet, the Proxy does not disclose who this representative was. Furthermore, throughout the

*Background of the Business Combination*, the Proxy does not provide the names of any of the referenced Canoo representatives that were part of the process leading up to the Proposed Transaction. *Id.* at 102-03. Defendants must disclose this information, so HCAC shareholders have a fully informed picture of the process leading up to the Proposed Transaction.

39. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act. Absent disclosure of the foregoing material information prior to the upcoming Shareholder Vote concerning the Proposed Transaction, Plaintiff will be unable to make an informed decision regarding whether to vote his shares in favor of the Proposed Transaction, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

40. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

41. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

42. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the

light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

43. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

44. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the financial projections for Canoo; (ii) whether Nomura and Stifel were paid advisory fees for their involvement in the Proposed Transaction; (iii) whether Nomura and Stifel had previously been engaged by Canoo; and (iv) certain information provided in the *Background of the Business Combination*.

45. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

46. The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that the Board reviewed the financial data provided

to them by Canoo.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

47. The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

48. HCAC is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

49. The misrepresentations and omissions in the Proxy are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

50. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

51. The Individual Defendants acted as controlling persons of HCAC within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of HCAC, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

52. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

53. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

54. In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed

and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

55. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

56. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

57. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III
**(Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)**

58. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

60. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

61. The misrepresentations and omissions in the Proxy are material, and Plaintiff will be

deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

62. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

B. Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D. Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 3, 2020  **MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*